UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA ADVOCATES FOR NURSING HOME REFORM, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>RON CHAPMAN, et al.,<br><br>Defendants. | Case No. 12-cv-06408-JST<br><br>**ORDER GRANTING MOTIONS TO DISMISS**<br><br>Re: ECF Nos. 8, 16 |

In this action for declaratory and injunctive relief, Plaintiffs California Advocates for Nursing Home Reform, Inc. and Gail Dawson allege that the Federal Nursing Home Reform Act preempts California's nursing facility licensing laws. In particular, Plaintiffs challenge the state's approval of a management agreement entered into between Defendants Country Villa East, L.P. and C.V. Westwood Single Purpose Entity, L.L.C., which are licensed by the state Department of Public Health to operate a skilled nursing facility, and Defendant Country Villa Service Corp., a nursing facility management company, on the grounds that the agreements delegate operational control of a skilled nursing facility to a third party in contravention of the Nursing Home Reform Act. The State Defendants and the Country Villa Defendants separately move to dismiss Plaintiffs' Complaint on several grounds. Because Plaintiffs lack Article III standing, the Court will grant the motions.

**I.    BACKGROUND**

   **A.    Statutory and Regulatory Framework**

      **i.    Federal Nursing Home Reform Act**

The Medicare Act, passed pursuant to Title XIX of the Social Security Act in 1965 and codified at 42 U.S.C. § 1395, *et seq.*, established a federally financed health insurance program for

the aged and disabled. 42 U.S.C. § 1395c. The Department of Health and Human Services ("HHS") oversees its implementation. Id. § 1395kk. In 1987, Congress amended the Medicare Act through the Nursing Home Reform Act ("NHRA"), passed as part of the Omnibus Budget Reconciliation Act, Pub. L. No. 100–203, §§ 4201–4218, 1987 U.S.C.C.A.N. (101 Stat.) 1330, 1330-160 to -221. The NHRA provides for the oversight and inspection of Skilled Nursing Facilities ("SNFs") that participate in Medicare and Nursing Facilities ("NFs") that participate in Medicaid. To participate, SNFs and NFs must comply with the requirements set forth at 42 U.S.C. § 1395i-3 and 1396r. The requirements for certification include satisfying certain standards in areas such as "quality of care" and "resident rights." Id. §§ 1395i–3(g), 1396r(g). To that end, HHS enters into agreements with state agencies to conduct surveys of facilities on its behalf. The NHRA authorizes HHS to engage in a variety of enforcement actions against facilities found to be non-compliant. See, e.g., id. § 1395i-3(h)(2)(B)(ii). The Act dictates that "[i]t is the duty and responsibility of the Secretary to assure that requirements which govern the provision of care in skilled nursing facilities under this subchapter, and the enforcement of such requirements, are adequate to protect the health, safety, welfare, and rights of residents and to promote the effective and efficient use of public moneys." Id. § 1395i-3(f)(1).

The administration requirements of the NHRA, id. § 1395i-3(d), form the basis of the complaint in this case. The NHRA provides that "[a] skilled nursing facility must be administered in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident." Id. § 1395i-3(d)(1)(A). SNFs must be licensed "under applicable State and local law." Id. § 1395i-3(d)(2)(A). The NHRA requires SNFs to notify the state agency responsible for licensing if a change occurs in:

> (i) the persons with an ownership or control interest . . . in the facility,
> (ii) the persons who are officers, directors, agents, or managing employees . . . of the facility,
> (iii) the corporation, association, or other company responsible for the management of the facility, or
> (iv) the individual who is the administrator or director of nursing of the facility.

2

Id. § 1395i-3(d)(1)(B).  "[T]he term 'managing employee' means, with respect to an entity, an individual, including a general manager, business manager, administrator, and director, who exercises operational or managerial control over the entity, or who directly or indirectly conducts the day-to-day operations of the entity."  Id. § 1320a-5(b).  "The administrator of a skilled nursing facility must meet standards established by the Secretary" through rulemaking, as provided for in section 1395i-3(f)(4).  Id. § 1395i-3(d)(1)(C).

### ii. Federal Nursing Home Regulations

Pursuant to its statutory directive, HHS promulgated regulations setting forth the standards for certification of SNFs for participation in the Medicare and Medicaid programs, codified at 42 C.F.R. 483.1, *et seq.*  Part 483.75 provides: "A facility must be administered in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident."  In particular, the regulations state:

> (d) Governing body
>
> (1) The facility must have a governing body, or designated persons functioning as a governing body, that is legally responsible for establishing and implementing policies regarding the management and operation of the facility; and
>
> (2) The governing body appoints the administrator who is —
>
>     (i) Licensed by the State where licensing is required; and
>
>     (ii) Responsible for management of the facility.

42 C.F.R. 483.75(d).  The regulations also require SNFs to notify state agencies responsible for licensing of changes in, for example, ownership or "managing employees," as described in the NHRA.  42 C.F.R. 483.75(p).  The term "managing employee" is defined as "a general manager, business manager, administrator, director, or other individual that exercises operational or managerial control over, or who directly or indirectly conducts, the day-to-day operation of the institution, organization, or agency, either under contract or through some other arrangement, whether or not the individual is a W-2 employee."  42 C.F.R. 420.201.

/ / /

3

### iii. California Statutory Framework

The California Department of Public Health ("CDPH") is the agency responsible for licensing SNFs in California. Cal. Health & Safety Code § 1250(c). Any entity seeking to manage a health facility must seek approval through a CDPH application process. Id. § 1265. CDPH also requires ownership disclosures similar to those required under federal law pursuant to Health and Safety Code section 1267.5. By permitting the licensing of management companies, California's regulatory regime permits the entity licensed to operate the facility to delegate managerial control over it to a third party.

### B. The Complaint

Plaintiffs filed this action in state court on October 22, 2012; the State Defendants removed the action to federal court, ECF No. 1 ("Compl."), and the Country Villa Defendants later joined in the removal, ECF No. 9.

Plaintiff California Advocates for Nursing Home Reform, Inc. ("CANHR") is a non-profit organization that "has been dedicated to improving care, quality of life, and choices for California's long term care consumers" since 1983. Compl. ¶ 1. CANHR "provide[s] consumers with information, legal referrals, and advocacy assistance to deter elder abuse and to improve the long term care system." Id. In service of its mission, CANHR is engaged in community education, direct advocacy, litigation, and policy work. CANHR alleges that it is a "beneficially interested party" in this action because it has an interest in seeking "enforcement of federal laws prescribing the organization and administration of skilled nursing facility businesses in order to promote the health and wellbeing of nursing home residents, and also to avoid fraud on the federal and state governments." Id.

Plaintiff Gail Dawson is a Nevada resident and niece of Minnie Bell Green, who died at an SNF operated by Defendants Country Villa Service Corp., Country Villa East, L.P., C.V. Westwood Single Purpose Entity, L.L.C., each of which Plaintiffs allege is owned and controlled by Defendant Steven Reisssman as trustee of the Reissman Family Trust (collectively, "the Country Villa Defendants"). The Complaint alleges that Ms. Green received inadequate care, was subjected to cruel and inhumane conditions, suffered, sickened, and died while a patient at the

facility. Id. ¶ 2.

Plaintiffs allege that Defendant Country Villa Service, Corp. ("CVSC") enters into management agreements with business entities that operate more than forty SNFs in the state of California. Id. ¶ 9. According to Plaintiffs, and the exemplar management agreement attached to their complaint as Exhibit 1, CVSC takes "operational control" of the facilities, including the duty to hire and fire employees. Id. "The only power reserved to the licensee in the management agreements is the power to consent to certain capital expenses." Id. The agreements typically provide for payment to CVSC of five percent of the facility's gross revenue. Id.

Plaintiffs allege that each agreement is approved by CDPH and its director, Defendant Ron Chapman. Id. ¶ 10. Plaintiffs attach as Exhibit 2 to the Complaint an exchange of correspondence between CANHR and CDPH in which CDPH explains that it is authorized to approve the management agreements pursuant to California Health and Safety Code sections 1265 and 1267.5.

The Complaint asserts that management agreements that delegate operational control of nursing facilities violate the provisions of the NHRA and its implementing regulations because SNFs and NFs participating in Medicare and Medicaid must be "under the operational control of and managed by an Administrator licensed by the State of California and employed by the licensee (and not by an outside management company)," and because the Administrator must be "directed by and answerable only to the skilled nursing facility's own 'governing body'" Id. ¶ 11 (citing 42 U.S.C. § 1395i-3(d)(1)(C) and 42 CFR 483.75(d)).

In addition, the Complaint alleges that the fee structure for CVSC's services has no "relation to the actual cost of providing management services to the licensee's business activity . . . and substantially exceeds the cost of said services." Id. ¶ 12. Plaintiffs assert that the fee structure violates the NHRA's admonition that SNFs must be administered "in a manner that enables [them] to use [their] resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and pscychological well-being of each resident." Id. (quoting 42 U.S.C. 1395i-3(d)(1)(A)).

The Complaint asserts three causes of action. First, as to the State of California, Governor Brown, the CDPH, and Ron Chapman, Plaintiffs seek declaratory relief in the form of an order

5

finding the provisions of the California statutory framework for licensing nursing facilities preempted by the NHRA and its implementing regulations. The first cause of action also seeks a declaration that the State is prohibited by the NHRA from authorizing payment of a licensee's financial resources to an outside management company based on a percentage of revenue or any other formula not directly tied to the actual cost of management services.

Second, Plaintiffs seek a declaration as to the Country Villa Defendants that their management agreements are legally invalid, and an injunction ordering CVSC to disgorge all sums paid to it by a nursing facility in the last four years, including both its five percent fee and reimbursement for operating costs. Alternatively, the second cause of action seeks an accounting from CVSC of all sums it claims represent proper charges for services rendered to a nursing facility in the last four years followed by disgorgement of a sum excluding "appropriate credit" for those services.

Third, Plaintiffs seek a permanent injunction prohibiting the Country Villa Defendants from receiving funds from licensee-operators' budgets on any account until those defendants can demonstrate they are in compliance with the state and federal laws set forth above.

## II.     REQUESTS FOR JUDICIAL NOTICE

Although the Court's review on a motion to dismiss is generally limited to the allegations in the complaint, In re New Century, 588 F. Supp. 2d 1206, 1211 (C.D. Cal. 2008), the Court may properly take judicial notice of material attached to the complaint, and of matters in the public record pursuant to Federal Rule of Evidence 201(b). See, e.g., Castillo-Villagra v. INS, 972 F.2d 1017, 1026 (9th Cir. 1992). The "incorporation by reference" doctrine applies when a "plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint." Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005). A court "shall take judicial notice if requested by a party and supplied with the necessary information." Fed. R. Evid. 201(d). See Sato v. Wachovia Mortg., FSB, No. 11-cv-00810-EJD, 2011 WL 2784567, at *2 (N.D. Cal. July 13, 2011).

Here, the parties have each requested that the Court take judicial notice of a number of

1   documents.  No party has objected to any of the requests.  Plaintiffs' Complaint attaches as
2   Exhibit 1 an exemplar management services agreement executed by CVSC and Country Villa
3   East, L.P. on March 16, 1996 for services in connection with the nursing facility Country Villa
4   Sheraton Nursing Center.  In addition, Exhibit 2 to the Complaint is a series of letters exchanged
5   between counsel for CANHR and CDPH discussing the approval of management agreements for
6   nursing home facilities.  In their Motion to Dismiss, the State Defendants submitted a portion of
7   the federal "State Operations Manual, Appendix PP — Guidance to Surveyors for Long Term
8   Health Care Facilities."  ECF No. 8-1, Ex. A.  The Country Villa Defendants also submitted
9   portions of that manual, as well as the internet address for the entire document as published by the
10  federal government.  ECF Nos. 17-1–17-3.  The Court finds that each of these documents are
11  properly subject to judicial notice and therefore GRANTS each request for judicial notice.

## III.   LEGAL STANDARDS

On a motion to dismiss, courts accept the material facts alleged in the complaint, together with reasonable inferences to be drawn from those facts, as true. Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  To be entitled to the presumption of truth, a complaint's allegations "must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011), cert. den'd, --- U.S. ----, 132 S.Ct. 2101 (2012).

In addition, to survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Plausibility does not mean probability, but it requires "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  In the Ninth Circuit, "[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6).

1  Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is
2  so convincing that plaintiff's explanation is implausible." Starr, 652 F.3d at 1216 (original
3  emphasis).

**IV.  ANALYSIS**

The State Defendants and the Country Villa Defendants separately move to dismiss on a number of grounds. Because the Court concludes that Plaintiffs lack Article III standing, however, it grants the motions on that basis, and declines to reach the remaining arguments.

To establish Article III standing, a plaintiff in federal court must meet three requirements. First, the plaintiff must have suffered an injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of — the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (citing cases). "When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue." Id. "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." Id. (quotation omitted).

These requirements are not pleading requirements. Rather, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." Id. Nevertheless, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." Id.

"In addition, even when a plaintiff is able to establish Article III standing, prudential considerations may preclude the exercise of federal jurisdiction. A plaintiff's claim must fall

within the "zone of interests" sought to be protected by the statute or constitutional provision in question. Bond v. United States, --- U.S. ----, 131 S. Ct. 2355, 2366–67 (2011). That claim must be based on the plaintiff's own legal rights and interests rather than the legal rights or interests of third parties. Elk Grove Unified School Dist. v. Newdow, 542 US 1, 14 (2004). And the injury must be individualized, or confined to a discrete group; courts will not adjudicate "abstract questions of wide public significance" amounting only to "generalized grievances." Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 474–75.

An association that has not suffered injury may have standing to sue in a representative capacity on behalf of its members provided: (1) at least one member has standing; (2) the interests sought to be protected are germane to the association's purpose; (3) and neither the claim asserted nor the relief requested requires that the members participate individually in the suit. Hunt v. Washington State Apple Advertising Comm'n, 432 US 333, 343 (1977).

Here, even assuming Plaintiffs interpret the NHRA correctly, they fail to allege a sufficiently direct injury, and the interests they are asserting would not be redressed by a favorable decision, because they do not identify any injury suffered by residents of nursing facilities resulting from the execution of third-party management agreements.[1]

Plaintiffs seek a declaration that provisions of California Health and Safety Code sections 1265 and 1267.5 are preempted by, and in conflict with, the NHRA and therefore invalid. The alleged conflict, according to Plaintiffs, is that federal law prohibits nursing facilities participating in Medicare and Medicaid from delegating operational control to a management company. But Plaintiffs themselves are not subject to these regulations — the injury they allege is substandard care at the hands of SNFs.

Plaintiffs have failed, however, to plead a direct causal connection between the execution of nursing home management agreements and the provision by nursing homes of substandard care.

---

[1] CANHR concedes that it has not alleged that one or more of its members are residents of Country Villa facilities, and it seeks leave to amend the Complaint to so allege. ECF No. 25 p. 6. For the reasons stated infra, this amendment by itself would not be sufficient to cure the deficiencies in Plaintiffs' Article III standing.

The execution of a management contract does not directly cause nursing home services to become substandard, just as the choice not to execute a management contract does not insure that a nursing home's care will be adequate. The two are simply untethered. If a nursing home resident receives substandard care, they may have a claim against the facility that provided that care, or the owners or managers of that facility — but that is not the claim Plaintiffs plead here. Because Plaintiffs do not adequately plead that substandard care at a nursing facility is more likely simply by virtue of that facility's execution of a management services contract, they have not established injury in fact or causation.

Plaintiffs also complain that the amount of compensation received by the management company in this particular case is excessive, but this fact does not change the outcome. There is no statutory or regulatory maximum on the compensation of nursing home management companies, and so there is no way for the Court — or anyone else — to conclude that the compensation is excessive. Also, it does not follow necessarily that a nursing home that employs an expensive management company provides substandard care, nor that a nursing home with a less expensive management company provides good care. And so, again, Plaintiffs are not able to show direct injury.

Plaintiffs also fail to satisfy the redressability requirement, because the issuance of the injunction Plaintiffs are seeking (to invalidate certain provisions of state law and invalidate certain management agreements) would not address the injuries they are claiming (substandard care). That is because the care provided to the individual plaintiff's decedent and the organizational plaintiff's members[2] depend on the actions of third parties who are not before the court — that is, the persons who provide the day-to-day care. As the Ninth Circuit explained in Levine v. Vilsack, 587 F.3d 986, 992 (9th Cir. 2009),

> When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he

---

[2] See n. 1, supra.

is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it. When, however, as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction-and perhaps on the response of others as well. The existence of one or more of the essential elements of standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," . . . and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury. Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily "substantially more difficult" to establish.

Id. (quoting Lujan, 504 U.S. at 561–62). Here, the nature and extent of Plaintiffs' factual allegations do not establish that the relief they seek would address the injuries they have identified. Plaintiffs therefore have not satisfied the redressability element of Article III standing.

## CONCLUSION

Plaintiffs have not established that they have Article III standing to bring this lawsuit. This Court is therefore without jurisdiction to adjudicate it.

For the foregoing reasons, Plaintiffs' Complaint is hereby DISMISSED. Plaintiffs have leave to file an amended complaint within 30 days of this Order.

**IT IS SO ORDERED**.

Dated: June 3, 2013

_____
JON S. TIGAR
United States District Judge