United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CALIFORNIA ADVOCATES FOR
NURSING HOME REFORM, INC., et al.,

Plaintiffs,

v.

RON CHAPMAN, et al.,

Defendants.

Case No.  12-cv-06408-JST

**ORDER GRANTING MOTIONS TO
DISMISS FIRST AMENDED
COMPLAINT**

Re: ECF Nos. 43, 46

In this action for declaratory and injunctive relief, Plaintiffs California Advocates for Nursing Home Reform, Inc. and Gail Dawson allege that the Federal Nursing Home Reform Act ("NHRA") preempts California's nursing facility licensing laws.  In particular, Plaintiffs challenge the State's approval of management agreements entered into between licensed operators of California skilled nursing facilities and Defendant Country Villa Service Corp., a nursing facility management company, on the grounds that the agreements delegate operational control of the facilities to a third party in contravention of the NHRA.  The State Defendants and the nursing home operators and management company separately move to dismiss Plaintiffs' First Amended Complaint on several grounds.  Because the Court again concludes that Plaintiffs lack Article III standing, the Court will grant the motions.

I.      **BACKGROUND**

A.      **Statutory and Regulatory Framework**

The Court summarized the statutory and regulatory framework governing nursing homes in California in its order granting the Defendants' prior motions to dismiss.  ECF No. 35 at 2–4.

B.      **The Parties and Claims**

Plaintiff California Advocates for Nursing Home Reform, Inc. ("CANHR") is a non-profit organization that "has been dedicated to improving care, quality of life, and choices for

California's long term care consumers" since 1983.  First Am. Compl. ("FAC"), ECF No. 36 ¶ 3.
CANHR "provide[s] consumers with information, legal referrals, and advocacy assistance to deter
elder abuse and to improve the long term care system."  Id.  In service of its mission, CANHR is
engaged in community education, direct advocacy, litigation, and policy work.  CANHR alleges
that it is a "beneficially interested party" in this action because it has an interest in seeking
"enforcement of federal laws prescribing the organization and administration of skilled nursing
facility businesses in order to promote the health and wellbeing of nursing home residents, and
also to avoid fraud on the federal and state governments."  Id.  In addition, "[o]ne or more
members of CANHR are residents of facilities operated by" Defendants Country Villa Service
Corp., Country Villa East, L.P., and C.V. Westwood Single Purpose Entity, LLC, and Defendant
Steven Reissman, as trustee for The Reissman Family Trust (collectively, "the Country Villa
Defendants").  Id.  "Residents of such facilities lack the time, energy, attention and resources
required to actively prosecute and participate in litigation."  Id.

Plaintiff Gail Dawson is a Nevada resident and the "duly appointed and acting
Administrator with Will Annexed of the Estate of Minnie Bell Green."  Prior to her death, Green
was a resident at a skilled nursing facility operated by the Country Villa Defendants, each of
which Plaintiffs allege is owned and controlled by Defendant Steven Reissman as trustee of the
Reissman Family Trust.  The Complaint alleges that Ms. Green "received inadequate care, was
subjected to cruel and inhumane conditions, suffered, sickened, and died while a patient at the
facility."  Id. ¶ 2.

Plaintiffs allege that Defendant Country Villa Service, Corp. ("CVSC") has entered into
management agreements with more than forty Skilled Nursing Facilities in the state of California.
Id. ¶ 9.  According to Plaintiffs, CVSC takes "operational control" of the facilities, including "the
duty and authority to hire and fire employees."  Id.  "The only power reserved to the licensee in
the management agreements is the power to consent to certain capital expenses."  Id.  The
agreements typically provide for payment to CVSC of five percent of the facility's gross revenue.
Id.

Each management agreement is approved by the California Department of Public Health

United States District Court
Northern District of California

1   ("CDPH") and its director, Defendant Ron Chapman.  Id. ¶ 10.  Plaintiffs assert that CDPH relies

2   on California Health & Safety Code sections 1265 and 1267.5 as authority for approving the

3   agreements.  Id.

4       The Complaint asserts that management agreements that delegate operational control of

5   Skilled Nursing Facilities ("SNFs") and Nursing Facilities ("NFs") violate the provisions of the

6   NHRA and its implementing regulations because SNFs and NFs participating in Medicare and

7   Medicaid must be "under the operational control of and managed by an Administrator licensed by

8   the State of California and employed by the licensee (and not by an outside management

9   company)," and because the Administrator must be "directed by and answerable only to the skilled

10   nursing facility's own 'governing body.'"  Id. ¶ 11 (citing 42 U.S.C. § 1395i-3(d)(1)(C) and 42

11   CFR 483.75(d)).

12       In addition, the Complaint alleges that the fee structure for CVSC's services has no

13   "relation to the actual cost of providing management services to the licensee's business

14   activity . . . and substantially exceeds the cost of said services."  Id. ¶ 12.  Plaintiffs assert that the

15   fee structure violates the NHRA's admonition that SNFs must be administered "in a manner that

16   enables [them] to use [their] resources effectively and efficiently to attain or maintain the highest

17   practicable physical, mental, and psychological well-being of each resident."  Id. (quoting 42

18   U.S.C. 1395i-3(d)(1)(A)).

19       The Complaint asserts three causes of action.  First, as to the State of California, Governor

20   Brown, the CDPH, and Ron Chapman, Plaintiffs seek declaratory relief in the form of an order

21   finding the provisions of the California statutory framework for licensing nursing facilities

22   preempted by the NHRA and its implementing regulations.  The first cause of action also seeks a

23   declaration that the State is prohibited by the NHRA from authorizing payment of a licensee's

24   financial resources to an outside management company based on a percentage of revenue or any

25   other formula not directly tied to the actual cost of management services.

26       Second, Plaintiffs seek a declaration as to the Country Villa Defendants that their

27   management agreements are legally invalid, and an injunction ordering CVSC to disgorge all

28   sums paid to it by a nursing facility in the last four years, including both its five percent fee and

United States District Court
Northern District of California

3

1    reimbursement for operating costs.  Alternatively, the second cause of action seeks an accounting

2    from CVSC of all sums it claims represent proper charges for services rendered to a nursing

3    facility in the last four years followed by disgorgement of a sum excluding "appropriate credit" for

4    those services.

5        Third, Plaintiffs seek a permanent injunction prohibiting the Country Villa Defendants

6    from receiving funds from licensee-operators' budgets on any account until those defendants can

7    demonstrate they are in compliance with the state and federal laws set forth above.

8        **C.    Procedural History**

9        Plaintiffs filed this action in state court on October 22, 2012, and the State Defendants

10   removed to this Court.  ECF No. 1.  The Country Villa Defendants later joined in the removal.

11   ECF No. 9.

12       The State and Country Villa Defendants independently filed motions to dismiss on January

13   15, 2013, and February 15, 2013, respectively.  ECF Nos. 8, 16.  The Court granted Defendants'

14   motions because Plaintiffs lacked Article III standing, and granted Plaintiffs leave to amend.  ECF

15   No. 35.

16       Plaintiffs filed their First Amended Complaint on June 24, 2013, adding four new

17   paragraphs.  FAC, ECF No. 36 ¶¶ 14–17; the other paragraphs in the FAC are materially identical.

18   The added language in the FAC includes Plaintiffs' arguments that management fees as a

19   percentage of gross revenue "inevitably lead to the licensee's repeated and historical failures to

20   comply with the crucial safeguards expressed in federal and state law establishing care

21   standards,"[1] and that failure to comply with state and federal standards "caused harm, injury and

22   death to the licensee's residents, including members of CANHR and Green."  FAC ¶ 16.

23   Additionally, Plaintiffs argue that "[i]mplementation of the management agreement leads to

24   violation of . . . federal and state standards."[2]  FAC ¶ 17.

25       The Country Villa and State Defendants filed separate motions to dismiss the FAC on July

26

27   _____

[1] Plaintiffs cite "generally" to 22 Cal. Code Regs. §§ 72301, *et seq.* and 42 CFR 483.1, *et seq.*
     FAC ¶ 16.

28   [2] Plaintiffs cite to 42 CFR §§ 483.30, 483.25, 483.20, and 22 Cal. Code Regs § 72501(e).  Id. ¶ 17.

United States District Court
Northern District of California

15, 2013 and July 22, 2013, respectively.  ECF Nos. 43, 46.  On August 13, 2013, Plaintiffs filed a consolidated response to both motions.  ECF No. 48.  The State and Country Villa Defendants filed replies on August 22, 2013, and August 23, 2013, respectively.  ECF Nos. 49, 50.

## II.  REQUESTS FOR JUDICIAL NOTICE

The Country Villa Defendants request that the Court take judicial notice of seven documents.  ECF No. 44.  The Request for Judicial Notice attaches as Exhibits A through C Plaintiff Gail Dawson's court documents from prior cases in the County of Los Angeles, where she asserted claims for damages on behalf of the estate of Minnie Bell Green.  Exhibits D through F are portions from the federal government's State Operations Manual, including the internet address for the entire document as published by the federal government.  Exhibit G is the Order from this Court on June 3, 2013, dismissing the original complaint.

The Court finds that Exhibits A through F are unnecessary to the decision of the present motion, and that the contents of Exhibit G are superseded by this order.  The Court therefore DENIES Defendants' requests for judicial notice.

## III.  LEGAL STANDARDS

On a motion to dismiss, courts accept the material facts alleged in the complaint, together with reasonable inferences to be drawn from those facts, as true.  Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In addition, to survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Plausibility does not mean probability, but it requires "more than a sheer possibility that a defendant has acted unlawfully."  Iqbal, 556 U.S. at 678.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.

## IV.  ANALYSIS

The State and Country Villa Defendants separately move to dismiss Plaintiffs' First

United States District Court
Northern District of California

5

1    Amended Complaint on a number of grounds.  The Court again concludes that Plaintiffs lack

2    Article III standing and that the Court does not have subject matter jurisdiction over Plaintiffs'

3    claims.  The Court will therefore grant the motions on that basis and decline to reach the

4    remaining arguments.

### A.   Plaintiffs' Standing Argument

6         The First Amended Complaint contains few additional allegations.  Plaintiffs allege that

7    the Nursing Home Reform Act and implementing federal regulations prohibit management

8    agreements for SNFs such as those executed by the Country Villa Defendants because federal law

9    "require[s] that skilled nursing facilities be under the operational control of and managed by an

10   Administrator licensed by the State of California and employed by the licensee (and not by an

11   outside management company), and further require that the Administrator be directed by and

12   answerable only to the skilled nursing facility's own 'governing body' (not an outside third-person

13   management company)."  FAC ¶ 11 (citing 42 U.S.C. § 1395i-3(d)(1)(C); 42 CFR § 483.75(d)).

14   Plaintiffs also allege that the State Defendants are liable because the State approved the use of

15   such management agreements pursuant to California Health & Safety Code sections 1265 and

16   1267.5, even though such agreements violate federal law.  FAC ¶¶ 10–11.

17        The management agreements allow more than forty SNFs to delegate control and money to

18   Defendant CVSC.  FAC ¶ 9.  Through the management agreements, CVSC "takes 'operational

19   control' of such nursing facilities, including the duty and authority to hire and fire employees.

20   The only power reserved to the licensee in the management agreements is the power to consent to

21   certain capital expenses."  Id.  Typically, the management agreements also provide that CVSC will

22   receive five percent of the SNF's gross revenue as compensation for its management services.  Id.

23        Plaintiffs now allege that the "usurpation" of the SNF Administrator's "power and

24   responsibility to assert and achieve operational control of any nursing home certified to accept

25   Medicare and or Medicaid patients deprives the Administrator of the power and responsibility to

26   comply with state law which directs and governs the office of Administrator."  Id. ¶ 14.

27   According to Plaintiffs,

28              [t]he primary interest of CVSC, as a management company, is to

United States District Court
Northern District of California

United States District Court
Northern District of California

> manage the skilled nursing facility in order to enhance profit, and
> not to comply with federal and state law regarding quality of care in
> the nursing home operation.  Deprived of operational control over
> the nursing home operation, including its administration and
> budgeting, any Administrator in a skilled nursing facility which has
> entered into a management agreement similar to the agreement
> attached hereto as Exhibit "1," cannot guide the facility to comply
> with state and federal regulations governing the facility, cannot act
> to prevent residents' rights or abuse, cannot adequately staff the
> nursing facility, and cannot assist the Director of Nursing in
> managing the facility's nursing service.  By the simple fact of
> paying a management fee of 5% to CVSC, Operating Company was
> deprived of funds necessary to operate within the requirements of
> federal and state laws and regulations pertaining to health care
> standards.

FAC ¶ 15.  That deprivation of control and funds, Plaintiffs assert, causes SNFs "inevitably" to

provide substandard care, thereby injuring Plaintiffs:

> The management agreement's provisions stripping power and
> responsibility from the facility's Administrator, as well as the
> provisions setting a management fee as a percentage of gross
> revenue each inevitably lead to the licensee's repeated and historical
> failures to comply with the crucial safeguards expressed in federal
> and state law establishing care standards.  Those are generally
> expressed at 22 Cal. Code Regs. §§ 72301, et seq. and 42 CFR
> 483.1, et seq.  The failure to comply with these standards caused
> harm, injury, and death to the licensee's residents, including
> members of CANHR and Green.

FAC ¶ 16.

### B. Standing

To establish Article III standing, a plaintiff in federal court must meet three requirements.

First, the plaintiff must have suffered an "injury in fact" — an invasion of a legally protected

interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or

hypothetical.  Second, there must be a causal connection between the injury and the conduct

complained of — the injury has to be fairly traceable to the challenged action of the defendant,

and not the result of the independent action of some third party not before the court.  Third, it must

be likely, as opposed to merely speculative, that the injury will be redressed by a favorable

decision.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992) (citing cases).

"When the suit is one challenging the legality of government action or inaction, the nature

and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial

7

1  stage) in order to establish standing depends considerably upon whether the plaintiff is himself an

2  object of the action (or forgone action) at issue." Id. at 561.  "[W]hen the plaintiff is not himself

3  the object of the government action or inaction he challenges, standing is not precluded, but it is

4  ordinarily substantially more difficult to establish." Id. at 562 (quotation omitted).  "[I]f the injury

5  stems not from the government action disputed, but from an independent source, a federal court

6  cannot provide the plaintiff redress by directing the government to alter its action." Boating

7  Industry Assoc. v. Marshall, 601 F.2d 1376, 1380 (9th Cir. 1979).

8          The standing requirements are not pleading requirements.  Rather, "each element must be

9  supported in the same way as any other matter on which the plaintiff bears the burden of proof,

10 *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation."

11 Lujan, 504 U.S at 561.  Nevertheless, "[a]t the pleading stage, general factual allegations of injury

12 resulting from the defendant's conduct may suffice." Id.  A "court's obligation to take a plaintiff

13 at its word at that stage in connection with Article III standing issues is primarily directed at the

14 injury in fact and causation issues, not redressability." Levine v. Vilsack, 587 F.3d 986, 996–97

15 (9th Cir. 2009) (citing Lujan, 504 U.S. at 561).  "[I]t is within the trial court's power to allow or to

16 require the plaintiff to supply, by amendment to the complaint or by affidavits, further

17 particularized allegations of fact deemed supportive of plaintiff's standing." Warth v. Seldin, 422

18 U.S. 490, 501–02 (1975).

19         In addition, even when a plaintiff is able to establish Article III standing, prudential

20 considerations may preclude the exercise of federal jurisdiction.  A plaintiff's claim must fall

21 within the "zone of interests" sought to be protected by the statute or constitutional provision in

22 question. Bond v. United States, ___ U.S. ____, 131 S. Ct. 2355, 2366–67 (2011).  That claim

23 must be based on the plaintiff's own legal rights and interests rather than the legal rights or

24 interests of third parties. Elk Grove Unified School Dist. v. Newdow, 542 US 1, 15 n.7 (2004).

25 And the injury must be individualized, or confined to a discrete group; courts will not adjudicate

26 "'abstract questions of wide public significance'" amounting only to "'generalized grievances.'"

27 Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454

28 U.S. 464, 474–75 (1982) (quoting Warth, 422 U.S. at 499–50).

8

The Court granted Defendants' motions to dismiss the original complaint because Plaintiffs failed to plead injury and "a direct causal connection between the execution of nursing home management agreements and the provision by nursing homes of substandard care." Order, ECF No. 35 at 9. Having reviewed the First Amended Complaint, the Court concludes that Plaintiffs still do not satisfy the causation and redressability requirements of Article III standing.

### 1.      Injury

The "injury in fact" test "'requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured.'" Lujan, 504 U.S. at 563 (quoting Sierra Club v. Morton, 405 U.S. 727, 734 (1972)). The purpose for requiring direct injury is the judicial system's "rough attempt to put the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome." Morton, 405 U.S. at 740. Because there are both an individual plaintiff and an associational plaintiff in this case, the Court must evaluate their ability to demonstrate injury separately.

In the FAC, Plaintiff Dawson now alleges that she sues as Administrator of Minnie Bell Green's estate, rather than on her own behalf. Dawson alleges that Minnie Bell Green "received inadequate care, was subjected to cruel and inhumane conditions, suffered, sickened and died while a patient at Country Villa East, L.P., C.V. Westwood Single Purpose Entity, L.L.C." FAC ¶ 2. That allegation is sufficiently concrete to satisfy the injury-in-fact requirement.

CANHR has not itself suffered a direct injury. However, an association that has not suffered injury may have standing to sue in a representative capacity on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977). An association may not have standing where "whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof." Warth, 422 U.S. at 515–16.

The Court finds that CANHR does not meet the requirements for associational standing.

"The interests [CANHR] seeks to protect are germane to the organization's purpose."  <u>Hunt</u>, 432

U.S. at 343.  Moreover, "neither the claim asserted nor the relief requested requires the

participation of individual members in the lawsuit," <u>id.</u>, because the injunctive relief CANHR

seeks would not require the participation of its individual members, <u>Org. for Advancement of</u>

<u>Minorities with Disabilities v. Brick Oven Rest.</u>, 406 F. Supp. 2d 1120, 1127 (S.D. Cal. 2005).

Thus, the first two elements of associational standing are satisfied.  CANHR nonetheless fails to

establish associational standing, however, because its individual members "would [not] otherwise

have standing to sue in their own right," <u>Hunt</u>, 432 U.S. at 343:  as set forth below, Plaintiffs are

unable to meet the causation and redressability requirements necessary to establish standing.

### 2.      Causation and Redressability

To establish causation, Plaintiffs must "show each link in the causal chain between the

defendant and the asserted injury."  <u>Zivkovich v. Vatican Bank</u>, 242 F. Supp. 2d 659, 670 (N.D.

Cal. 2002).  This "causal chain" is more difficult to establish where, as here, the asserted injury

results from the actions of third parties.  As the Ninth Circuit has stated,

> [a] causal chain does not fail simply because it has several "links,"
> provided that the links are "not hypothetical or tenuous" and remain
> "plausib[le]."   In cases where a chain of causation "involves
> numerous third parties" whose "independent decisions" collectively
> have a "significant effect" on plaintiffs' injuries, the Supreme Court
> and this court have found the causal chain too weak to support
> standing at the pleading stage.

<u>Maya v. Centex Corp.</u>, 658 F.3d 1060, 1070 (9th Cir. 2011) (quoting <u>Nat'l Audubon Soc., Inc. v.</u>

<u>Davis</u>, 307 F.3d 835, 849 (9th Cir. 2002); <u>Allen v. Wright</u>, 468 U.S. 737, 759 (1984)).

To demonstrate standing in this case, Plaintiffs "must allege *specific, concrete facts*

demonstrating that the challenged practices [the State's approval of the subject management

agreements] harm [them], and that [they] personally would benefit in a tangible way from the

Court's intervention."  <u>Warth</u>, 422 U.S. at 505–08 (emphasis added).  That means that Plaintiffs

"must allege facts from which it reasonably could be inferred" that "there is a *substantial*

*probability*" that the quality of care at California SNFs would have stayed the same or improved if

the State had refused to approve the management agreements at issue.  <u>Id.</u> at 504 (emphasis

10

added).

      In addition to causation, a plaintiff must also demonstrate "redressability." "[I]t must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Lujan, 504 U.S. at 561 (quoting Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 38, 43 (1976)). Like causation, redressability can be particularly difficult to demonstrate when the actions of third parties are at issue, because "any pleading directed at the likely actions of third parties or of parties under separate and independent statutory obligations would almost necessarily be conclusory and speculative." Levine, 587 F.3d at 997. That is because, when the injury arises "from the government's allegedly unlawful regulation (or lack of regulation) of someone else . . . . causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction — and perhaps on the response of others as well." Lujan, 504 U.S. at 562 (emphasis omitted). A plaintiff's claims are not redressable when "it is entirely conjectural whether the [third parties'] activity that affects [the plaintiff] will be altered or affected by the [government's] activity they seek to achieve." Id. at 571.

      Simon v. Eastern Ky. Welfare Rights Org., supra, demonstrates this principle on facts like those before the Court. In Simon, indigents and organizations dedicated to promoting access of the poor to healthcare sued the Internal Revenue Service ("IRS") for issuing a Revenue Ruling allowing favorable tax treatment to a nonprofit hospital that offered only emergency-room services to indigents, rather than more extensive services. The Court held that the individual plaintiffs lacked standing because "it does not follow from the allegation and its corollary that the denial of access to hospital services in fact results from petitioners' new Ruling, or that a court-ordered return by petitioners to their previous policy would result in these respondents' receiving the hospital services they desire." 426 U.S. at 41. The Court found that it was "purely speculative whether the denials of service specified in the complaint fairly can be traced to petitioners' 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications." Id. at 42. See also Allen, 468 U.S. at 739 (parents of African-American public school children lacked standing to challenge IRS grant of tax-exempt status to segregated schools because it was "entirely speculative . . . whether withdrawal of a tax exemption from any

United States District Court
Northern District of California

11

1   particular school would lead the school to change its policies."); Linda R.S. v. Richard D., 410

2   U.S. 614, 618 (1973) (mother of illegitimate child who sued state for failing to bring non-support

3   prosecutions of fathers of illegitimate children lacked standing because "[t]he prospect that

4   prosecution will, at least in the future, result in payment of support can, at best, be termed only

5   speculative.").

6           Similarly, relying on Allen and Simon, the Ninth Circuit in Fernandez v. Brock, 840 F.2d

7   622, 628 (9th Cir. 1988), held that migrant workers lacked standing to seek a court order forcing

8   the Secretary of Labor to establish regulations that might affect their eligibility for retirement

9   benefits.  The court reasoned that "the farmworkers do not know what the regulations will say and

10  cannot predict whether their employer will continue to offer a pension plan at all.  Therefore, it is

11  speculative whether the relief they seek will increase their opportunity to receive pension

12  benefits."  Id.  See also Alaska Ctr. for Env't v. Browner, 20 F.3d 981, 985 (9th Cir. 1994)

13  (discussing Fernandez).

14          Applying the foregoing authorities here leads to the conclusion that Plaintiffs cannot

15  demonstrate either causation or redressability.  Plaintiffs assert that the State's approval of

16  management agreements leads to the delegation of operational control of SNFs to third parties,

17  which, in turn, leads to substandard care.  Crucial links are missing in Plaintiffs' causal chain.  See

18  Zivkovich, 242 F. Supp. 2d at 670.  For example, Plaintiffs claim that management agreements

19  that strip an SNF's Administrator of power and responsibility "inevitably lead to the licensee's

20  repeated and historical failures to comply with the crucial safeguards expressed in federal and state

21  law establishing care standards."  This conclusory, *ipse dixit* allegation does not establish the

22  required "causal chain," because it does not state how the alleged substandard care *results* from

23  the adoption of management agreements.  It also fails even to allege, much less establish as a

24  matter of logic, (1) that monies not spent on management agreements by definition would be spent

25  on care, or (2) that if management fees were instead spent on care, the nursing facilities in

26  question would meet "establish[ed] care standards."  Thus, the FAC fails to allege causation.

27          For similar reasons, Plaintiffs have also failed to establish that the declaration they seek

28  will redress their asserted injuries because it is speculative whether the invalidation of the subject

United States District Court
Northern District of California

12

management agreements would raise the quality of care in SNFs.  As in <u>Simon</u>, it is unclear that a "court-ordered return . . . to [the nursing homes'] previous policy would result in [Plaintiffs] receiving the [nursing home] services they desire."  426 U.S. at 41.  Thus, the FAC also fails to establish redressability.[3]

## V.   CONCLUSION

For the foregoing reasons, the Court again concludes that Plaintiffs lack Article III standing.  Because Plaintiffs were unable to cure the deficiencies in their prior complaint after having been given an opportunity to do so, the Court finds that it would be futile to provide any further opportunity to amend.  The action is DISMISSED with prejudice.

**IT IS SO ORDERED.**

Dated:  November 5, 2013

_____
JON S. TIGAR
United States District Judge

_____

[3] Plaintiff Dawson lacks standing for the additional reason that she seeks declaratory and injunctive relief on behalf of the estate of a deceased former SNF resident.  Prospective relief cannot redress past harms.

United States District Court
Northern District of California