UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CALIFORNIA ADVOCATES FOR
NURSING HOME REFORM, INC., et al.,

           Plaintiffs,

      v.

RON CHAPMAN, et al.,

           Defendants.

Case No.  12-cv-06408-JST

**ORDER GRANTING MOTIONS TO
DISMISS FIRST AMENDED
COMPLAINT**

Re: ECF Nos. 43, 46

In this action for declaratory and injunctive relief, Plaintiffs California Advocates for

Nursing Home Reform, Inc. and Gail Dawson allege that the Federal Nursing Home Reform Act

("NHRA") preempts California's nursing facility licensing laws.  In particular, Plaintiffs challenge

the State's approval of management agreements entered into between licensed operators of

California skilled nursing facilities and Defendant Country Villa Service Corp., a nursing facility

management company, on the grounds that the agreements delegate operational control of the

facilities to a third party in contravention of the NHRA.  The State Defendants and the nursing

home operators and management company separately move to dismiss Plaintiffs' First Amended

Complaint on several grounds.  Because the Court again concludes that Plaintiffs lack Article III

standing, the Court will grant the motions.

## I.      BACKGROUND

###     A.      Statutory and Regulatory Framework

The Court summarized the statutory and regulatory framework governing nursing homes in

California in its order granting the Defendants' prior motions to dismiss.  ECF No. 35 at 2–4.

###     B.      The Parties and Claims

Plaintiff California Advocates for Nursing Home Reform, Inc. ("CANHR") is a non-profit

organization that "has been dedicated to improving care, quality of life, and choices for

California's long term care consumers" since 1983.  First Am. Compl. ("FAC"), ECF No. 36 ¶ 3.

CANHR "provide[s] consumers with information, legal referrals, and advocacy assistance to deter

elder abuse and to improve the long term care system."  Id.  In service of its mission, CANHR is

engaged in community education, direct advocacy, litigation, and policy work.  CANHR alleges

that it is a "beneficially interested party" in this action because it has an interest in seeking

"enforcement of federal laws prescribing the organization and administration of skilled nursing

facility businesses in order to promote the health and wellbeing of nursing home residents, and

also to avoid fraud on the federal and state governments."  Id.  In addition, "[o]ne or more

members of CANHR are residents of facilities operated by" Defendants Country Villa Service

Corp., Country Villa East, L.P., and C.V. Westwood Single Purpose Entity, LLC, and Defendant

Steven Reissman, as trustee for The Reissman Family Trust (collectively, "the Country Villa

Defendants").  Id.  "Residents of such facilities lack the time, energy, attention and resources

required to actively prosecute and participate in litigation."  Id.

Plaintiff Gail Dawson is a Nevada resident and the "duly appointed and acting

Administrator with Will Annexed of the Estate of Minnie Bell Green."  Prior to her death, Green

was a resident at a skilled nursing facility operated by the Country Villa Defendants, each of

which Plaintiffs allege is owned and controlled by Defendant Steven Reissman as trustee of the

Reissman Family Trust.  The Complaint alleges that Ms. Green "received inadequate care, was

subjected to cruel and inhumane conditions, suffered, sickened, and died while a patient at the

facility."  Id. ¶ 2.

Plaintiffs allege that Defendant Country Villa Service, Corp. ("CVSC") has entered into

management agreements with more than forty Skilled Nursing Facilities in the state of California.

Id. ¶ 9.  According to Plaintiffs, CVSC takes "operational control" of the facilities, including "the

duty and authority to hire and fire employees."  Id.  "The only power reserved to the licensee in

the management agreements is the power to consent to certain capital expenses."  Id.  The

agreements typically provide for payment to CVSC of five percent of the facility's gross revenue.

Id.

Each management agreement is approved by the California Department of Public Health

2

United States District Court
Northern District of California

("CDPH") and its director, Defendant Ron Chapman.  Id. ¶ 10.  Plaintiffs assert that CDPH relies on California Health & Safety Code sections 1265 and 1267.5 as authority for approving the agreements.  Id.

The Complaint asserts that management agreements that delegate operational control of Skilled Nursing Facilities ("SNFs") and Nursing Facilities ("NFs") violate the provisions of the NHRA and its implementing regulations because SNFs and NFs participating in Medicare and Medicaid must be "under the operational control of and managed by an Administrator licensed by the State of California and employed by the licensee (and not by an outside management company)," and because the Administrator must be "directed by and answerable only to the skilled nursing facility's own 'governing body.'"  Id. ¶ 11 (citing 42 U.S.C. § 1395i-3(d)(1)(C) and 42 CFR 483.75(d)).

In addition, the Complaint alleges that the fee structure for CVSC's services has no "relation to the actual cost of providing management services to the licensee's business activity . . . and substantially exceeds the cost of said services."  Id. ¶ 12.  Plaintiffs assert that the fee structure violates the NHRA's admonition that SNFs must be administered "in a manner that enables [them] to use [their] resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychological well-being of each resident."  Id. (quoting 42 U.S.C. 1395i-3(d)(1)(A)).

The Complaint asserts three causes of action.  First, as to the State of California, Governor Brown, the CDPH, and Ron Chapman, Plaintiffs seek declaratory relief in the form of an order finding the provisions of the California statutory framework for licensing nursing facilities preempted by the NHRA and its implementing regulations.  The first cause of action also seeks a declaration that the State is prohibited by the NHRA from authorizing payment of a licensee's financial resources to an outside management company based on a percentage of revenue or any other formula not directly tied to the actual cost of management services.

Second, Plaintiffs seek a declaration as to the Country Villa Defendants that their management agreements are legally invalid, and an injunction ordering CVSC to disgorge all sums paid to it by a nursing facility in the last four years, including both its five percent fee and

1    reimbursement for operating costs.  Alternatively, the second cause of action seeks an accounting

2    from CVSC of all sums it claims represent proper charges for services rendered to a nursing

3    facility in the last four years followed by disgorgement of a sum excluding "appropriate credit" for

4    those services.

5        Third, Plaintiffs seek a permanent injunction prohibiting the Country Villa Defendants

6    from receiving funds from licensee-operators' budgets on any account until those defendants can

7    demonstrate they are in compliance with the state and federal laws set forth above.

8        **C.    Procedural History**

9        Plaintiffs filed this action in state court on October 22, 2012, and the State Defendants

10   removed to this Court.  ECF No. 1.  The Country Villa Defendants later joined in the removal.

11   ECF No. 9.

12       The State and Country Villa Defendants independently filed motions to dismiss on January

13   15, 2013, and February 15, 2013, respectively.  ECF Nos. 8, 16.  The Court granted Defendants'

14   motions because Plaintiffs lacked Article III standing, and granted Plaintiffs leave to amend.  ECF

15   No. 35.

16       Plaintiffs filed their First Amended Complaint on June 24, 2013, adding four new

17   paragraphs.  FAC, ECF No. 36 ¶¶ 14–17; the other paragraphs in the FAC are materially identical.

18   The added language in the FAC includes Plaintiffs' arguments that management fees as a

19   percentage of gross revenue "inevitably lead to the licensee's repeated and historical failures to

20   comply with the crucial safeguards expressed in federal and state law establishing care

21   standards,"[1] and that failure to comply with state and federal standards "caused harm, injury and

22   death to the licensee's residents, including members of CANHR and Green."  FAC ¶ 16.

23   Additionally, Plaintiffs argue that "[i]mplementation of the management agreement leads to

24   violation of . . . federal and state standards."[2]  FAC ¶ 17.

25       The Country Villa and State Defendants filed separate motions to dismiss the FAC on July

26   _____

27   [1] Plaintiffs cite "generally" to 22 Cal. Code Regs. §§ 72301, *et seq.* and 42 CFR 483.1, *et seq.*
     FAC ¶ 16.

28   [2] Plaintiffs cite to 42 CFR §§ 483.30, 483.25, 483.20, and 22 Cal. Code Regs § 72501(e).  Id. ¶ 17.

United States District Court
Northern District of California

1   15, 2013 and July 22, 2013, respectively.  ECF Nos. 43, 46.  On August 13, 2013, Plaintiffs filed a

2   consolidated response to both motions.  ECF No. 48.  The State and Country Villa Defendants

3   filed replies on August 22, 2013, and August 23, 2013, respectively.  ECF Nos. 49, 50.

4   **II.      REQUESTS FOR JUDICIAL NOTICE**

5            The Country Villa Defendants request that the Court take judicial notice of seven

6   documents.  ECF No. 44.  The Request for Judicial Notice attaches as Exhibits A through C

7   Plaintiff Gail Dawson's court documents from prior cases in the County of Los Angeles, where

8   she asserted claims for damages on behalf of the estate of Minnie Bell Green.  Exhibits D through

9   F are portions from the federal government's State Operations Manual, including the internet

10  address for the entire document as published by the federal government.  Exhibit G is the Order

11  from this Court on June 3, 2013, dismissing the original complaint.

12           The Court finds that Exhibits A through F are unnecessary to the decision of the present

13  motion, and that the contents of Exhibit G are superseded by this order.  The Court therefore

14  DENIES Defendants' requests for judicial notice.

15  **III.     LEGAL STANDARDS**

16           On a motion to dismiss, courts accept the material facts alleged in the complaint, together

17  with reasonable inferences to be drawn from those facts, as true.  Navarro v. Block, 250 F.3d 729,

18  732 (9th Cir. 2001).  However, "the tenet that a court must accept a complaint's allegations as true

19  is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory

20  statements."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

21           In addition, to survive a motion to dismiss, a plaintiff must plead "enough facts to state a

22  claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570

23  (2007).  Plausibility does not mean probability, but it requires "more than a sheer possibility that a

24  defendant has acted unlawfully."  Iqbal, 556 U.S. at 678.  "A claim has facial plausibility when the

25  plaintiff pleads factual content that allows the court to draw the reasonable inference that the

26  defendant is liable for the misconduct alleged."  Id.

27  **IV.     ANALYSIS**

28           The State and Country Villa Defendants separately move to dismiss Plaintiffs' First

United States District Court
Northern District of California

5

Amended Complaint on a number of grounds.  The Court again concludes that Plaintiffs lack Article III standing and that the Court does not have subject matter jurisdiction over Plaintiffs' claims.  The Court will therefore grant the motions on that basis and decline to reach the remaining arguments.

### A.    Plaintiffs' Standing Argument

The First Amended Complaint contains few additional allegations.  Plaintiffs allege that the Nursing Home Reform Act and implementing federal regulations prohibit management agreements for SNFs such as those executed by the Country Villa Defendants because federal law "require[s] that skilled nursing facilities be under the operational control of and managed by an Administrator licensed by the State of California and employed by the licensee (and not by an outside management company), and further require that the Administrator be directed by and answerable only to the skilled nursing facility's own 'governing body' (not an outside third-person management company)."  FAC ¶ 11 (citing 42 U.S.C. § 1395i-3(d)(1)(C); 42 CFR § 483.75(d)).  Plaintiffs also allege that the State Defendants are liable because the State approved the use of such management agreements pursuant to California Health & Safety Code sections 1265 and 1267.5, even though such agreements violate federal law.  FAC ¶¶ 10–11.

The management agreements allow more than forty SNFs to delegate control and money to Defendant CVSC.  FAC ¶ 9.  Through the management agreements, CVSC "takes 'operational control' of such nursing facilities, including the duty and authority to hire and fire employees.  The only power reserved to the licensee in the management agreements is the power to consent to certain capital expenses."  Id.  Typically, the management agreements also provide that CVSC will receive five percent of the SNF's gross revenue as compensation for its management services.  Id.

Plaintiffs now allege that the "usurpation" of the SNF Administrator's "power and responsibility to assert and achieve operational control of any nursing home certified to accept Medicare and or Medicaid patients deprives the Administrator of the power and responsibility to comply with state law which directs and governs the office of Administrator."  Id. ¶ 14.  According to Plaintiffs,

> [t]he primary interest of CVSC, as a management company, is to

6

> manage the skilled nursing facility in order to enhance profit, and not to comply with federal and state law regarding quality of care in the nursing home operation.  Deprived of operational control over the nursing home operation, including its administration and budgeting, any Administrator in a skilled nursing facility which has entered into a management agreement similar to the agreement attached hereto as Exhibit "1," cannot guide the facility to comply with state and federal regulations governing the facility, cannot act to prevent residents' rights or abuse, cannot adequately staff the nursing facility, and cannot assist the Director of Nursing in managing the facility's nursing service.  By the simple fact of paying a management fee of 5% to CVSC, Operating Company was deprived of funds necessary to operate within the requirements of federal and state laws and regulations pertaining to health care standards.

FAC ¶ 15.  That deprivation of control and funds, Plaintiffs assert, causes SNFs "inevitably" to provide substandard care, thereby injuring Plaintiffs:

> The management agreement's provisions stripping power and responsibility from the facility's Administrator, as well as the provisions setting a management fee as a percentage of gross revenue each inevitably lead to the licensee's repeated and historical failures to comply with the crucial safeguards expressed in federal and state law establishing care standards.  Those are generally expressed at 22 Cal. Code Regs. §§ 72301, et seq. and 42 CFR 483.1, et seq.  The failure to comply with these standards caused harm, injury, and death to the licensee's residents, including members of CANHR and Green.

FAC ¶ 16.

## B. Standing

To establish Article III standing, a plaintiff in federal court must meet three requirements.  First, the plaintiff must have suffered an "injury in fact" — an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of — the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992) (citing cases).

"When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial

7

stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue." Id. at 561.  "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." Id. at 562 (quotation omitted).  "[I]f the injury stems not from the government action disputed, but from an independent source, a federal court cannot provide the plaintiff redress by directing the government to alter its action." Boating Industry Assoc. v. Marshall, 601 F.2d 1376, 1380 (9th Cir. 1979).

The standing requirements are not pleading requirements.  Rather, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." Lujan, 504 U.S at 561.  Nevertheless, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." Id.  A "court's obligation to take a plaintiff at its word at that stage in connection with Article III standing issues is primarily directed at the injury in fact and causation issues, not redressability." Levine v. Vilsack, 587 F.3d 986, 996–97 (9th Cir. 2009) (citing Lujan, 504 U.S. at 561).  "[I]t is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing." Warth v. Seldin, 422 U.S. 490, 501–02 (1975).

In addition, even when a plaintiff is able to establish Article III standing, prudential considerations may preclude the exercise of federal jurisdiction.  A plaintiff's claim must fall within the "zone of interests" sought to be protected by the statute or constitutional provision in question. Bond v. United States, ___ U.S. ____, 131 S. Ct. 2355, 2366–67 (2011).  That claim must be based on the plaintiff's own legal rights and interests rather than the legal rights or interests of third parties. Elk Grove Unified School Dist. v. Newdow, 542 US 1, 15 n.7 (2004). And the injury must be individualized, or confined to a discrete group; courts will not adjudicate "'abstract questions of wide public significance'" amounting only to "'generalized grievances.'" Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 474–75 (1982) (quoting Warth, 422 U.S. at 499–50).

8

1    The Court granted Defendants' motions to dismiss the original complaint because

2    Plaintiffs failed to plead injury and "a direct causal connection between the execution of nursing

3    home management agreements and the provision by nursing homes of substandard care."  Order,

4    ECF No. 35 at 9.  Having reviewed the First Amended Complaint, the Court concludes that

5    Plaintiffs still do not satisfy the causation and redressability requirements of Article III standing.

6              **1.      Injury**

7    The "injury in fact" test "'requires more than an injury to a cognizable interest.  It requires

8    that the party seeking review be himself among the injured.'"  Lujan, 504 U.S. at 563 (quoting

9    Sierra Club v. Morton, 405 U.S. 727, 734 (1972)).  The purpose for requiring direct injury is the

10   judicial system's "rough attempt to put the decision as to whether review will be sought in the

11   hands of those who have a direct stake in the outcome."  Morton, 405 U.S. at 740.  Because there

12   are both an individual plaintiff and an associational plaintiff in this case, the Court must evaluate

13   their ability to demonstrate injury separately.

14   In the FAC, Plaintiff Dawson now alleges that she sues as Administrator of Minnie Bell

15   Green's estate, rather than on her own behalf.  Dawson alleges that Minnie Bell Green "received

16   inadequate care, was subjected to cruel and inhumane conditions, suffered, sickened and died

17   while a patient at Country Villa East, L.P., C.V. Westwood Single Purpose Entity, L.L.C."  FAC ¶

18   2.  That allegation is sufficiently concrete to satisfy the injury-in-fact requirement.

19   CANHR has not itself suffered a direct injury.  However, an association that has not

20   suffered injury may have standing to sue in a representative capacity on behalf of its members

21   when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it

22   seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor

23   the relief requested requires the participation of individual members in the lawsuit."  Hunt v.

24   Washington State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977).  An association may not

25   have standing where "whatever injury may have been suffered is peculiar to the individual

26   member concerned, and both the fact and extent of injury would require individualized proof."

27   Warth, 422 U.S. at 515–16.

28   The Court finds that CANHR does not meet the requirements for associational standing.

United States District Court
Northern District of California

9

1    "The interests [CANHR] seeks to protect are germane to the organization's purpose." <u>Hunt</u>, 432

2    U.S. at 343.  Moreover, "neither the claim asserted nor the relief requested requires the

3    participation of individual members in the lawsuit," <u>id.</u>, because the injunctive relief CANHR

4    seeks would not require the participation of its individual members, <u>Org. for Advancement of</u>

5    <u>Minorities with Disabilities v. Brick Oven Rest.</u>, 406 F. Supp. 2d 1120, 1127 (S.D. Cal. 2005).

6    Thus, the first two elements of associational standing are satisfied.  CANHR nonetheless fails to

7    establish associational standing, however, because its individual members "would [not] otherwise

8    have standing to sue in their own right," <u>Hunt</u>, 432 U.S. at 343:  as set forth below, Plaintiffs are

9    unable to meet the causation and redressability requirements necessary to establish standing.

### 2.    Causation and Redressability

11    To establish causation, Plaintiffs must "show each link in the causal chain between the

12    defendant and the asserted injury." <u>Zivkovich v. Vatican Bank</u>, 242 F. Supp. 2d 659, 670 (N.D.

13    Cal. 2002).  This "causal chain" is more difficult to establish where, as here, the asserted injury

14    results from the actions of third parties.  As the Ninth Circuit has stated,

> [a] causal chain does not fail simply because it has several "links,"
> provided that the links are "not hypothetical or tenuous" and remain
> "plausib[le]."   In cases where a chain of causation "involves
> numerous third parties" whose "independent decisions" collectively
> have a "significant effect" on plaintiffs' injuries, the Supreme Court
> and this court have found the causal chain too weak to support
> standing at the pleading stage.

<u>Maya v. Centex Corp.</u>, 658 F.3d 1060, 1070 (9th Cir. 2011) (quoting <u>Nat'l Audubon Soc., Inc. v.</u>

<u>Davis</u>, 307 F.3d 835, 849 (9th Cir. 2002); <u>Allen v. Wright</u>, 468 U.S. 737, 759 (1984)).

To demonstrate standing in this case, Plaintiffs "must allege *specific, concrete facts*

demonstrating that the challenged practices [the State's approval of the subject management

agreements] harm [them], and that [they] personally would benefit in a tangible way from the

Court's intervention." <u>Warth</u>, 422 U.S. at 505–08 (emphasis added).  That means that Plaintiffs

"must allege facts from which it reasonably could be inferred" that "there is a *substantial*

*probability*" that the quality of care at California SNFs would have stayed the same or improved if

the State had refused to approve the management agreements at issue.  <u>Id.</u> at 504 (emphasis

10

1    added).

2         In addition to causation, a plaintiff must also demonstrate "redressability."  "[I]t must be

3    'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable

4    decision.'"  Lujan, 504 U.S. at 561 (quoting Simon v. Eastern Ky. Welfare Rights Org., 426 U.S.

5    26, 38, 43 (1976)).  Like causation, redressability can be particularly difficult to demonstrate when

6    the actions of third parties are at issue, because "any pleading directed at the likely actions of third

7    parties or of parties under separate and independent statutory obligations would almost necessarily

8    be conclusory and speculative."  Levine, 587 F.3d at 997.  That is because, when the injury arises

9    "from the government's allegedly unlawful regulation (or lack of regulation) of someone else . . . .

10   causation and redressability ordinarily hinge on the response of the regulated (or regulable) third

11   party to the government action or inaction — and perhaps on the response of others as well."

12   Lujan, 504 U.S. at 562 (emphasis omitted).  A plaintiff's claims are not redressable when "it is

13   entirely conjectural whether the [third parties'] activity that affects [the plaintiff] will be altered or

14   affected by the [government's] activity they seek to achieve."  Id. at 571.

15        Simon v. Eastern Ky. Welfare Rights Org., supra, demonstrates this principle on facts like

16   those before the Court.  In Simon, indigents and organizations dedicated to promoting access of

17   the poor to healthcare sued the Internal Revenue Service ("IRS") for issuing a Revenue Ruling

18   allowing favorable tax treatment to a nonprofit hospital that offered only emergency-room services

19   to indigents, rather than more extensive services.  The Court held that the individual plaintiffs

20   lacked standing because "it does not follow from the allegation and its corollary that the denial of

21   access to hospital services in fact results from petitioners' new Ruling, or that a court-ordered

22   return by petitioners to their previous policy would result in these respondents' receiving the

23   hospital services they desire."  426 U.S. at 41.  The Court found that it was "purely speculative

24   whether the denials of service specified in the complaint fairly can be traced to petitioners'

25   'encouragement' or instead result from decisions made by the hospitals without regard to the tax

26   implications."  Id. at 42.  See also Allen, 468 U.S. at 739 (parents of African-American public

27   school children lacked standing to challenge IRS grant of tax-exempt status to segregated schools

28   because it was "entirely speculative . . . whether withdrawal of a tax exemption from any

United States District Court
Northern District of California

particular school would lead the school to change its policies."); <u>Linda R.S. v. Richard D.</u>, 410 U.S. 614, 618 (1973) (mother of illegitimate child who sued state for failing to bring non-support prosecutions of fathers of illegitimate children lacked standing because "[t]he prospect that prosecution will, at least in the future, result in payment of support can, at best, be termed only speculative.").

Similarly, relying on <u>Allen</u> and <u>Simon</u>, the Ninth Circuit in <u>Fernandez v. Brock</u>, 840 F.2d 622, 628 (9th Cir. 1988), held that migrant workers lacked standing to seek a court order forcing the Secretary of Labor to establish regulations that might affect their eligibility for retirement benefits.  The court reasoned that "the farmworkers do not know what the regulations will say and cannot predict whether their employer will continue to offer a pension plan at all.  Therefore, it is speculative whether the relief they seek will increase their opportunity to receive pension benefits."  <u>Id.</u>  <u>See also</u> <u>Alaska Ctr. for Env't v. Browner</u>, 20 F.3d 981, 985 (9th Cir. 1994) (discussing <u>Fernandez</u>).

Applying the foregoing authorities here leads to the conclusion that Plaintiffs cannot demonstrate either causation or redressability.  Plaintiffs assert that the State's approval of management agreements leads to the delegation of operational control of SNFs to third parties, which, in turn, leads to substandard care.  Crucial links are missing in Plaintiffs' causal chain.  <u>See</u> <u>Zivkovich</u>, 242 F. Supp. 2d at 670.  For example, Plaintiffs claim that management agreements that strip an SNF's Administrator of power and responsibility "inevitably lead to the licensee's repeated and historical failures to comply with the crucial safeguards expressed in federal and state law establishing care standards."  This conclusory, *ipse dixit* allegation does not establish the required "causal chain," because it does not state how the alleged substandard care *results* from the adoption of management agreements.  It also fails even to allege, much less establish as a matter of logic, (1) that monies not spent on management agreements by definition would be spent on care, or (2) that if management fees were instead spent on care, the nursing facilities in question would meet "establish[ed] care standards."  Thus, the FAC fails to allege causation.

For similar reasons, Plaintiffs have also failed to establish that the declaration they seek will redress their asserted injuries because it is speculative whether the invalidation of the subject

management agreements would raise the quality of care in SNFs. As in <u>Simon</u>, it is unclear that a "court-ordered return . . . to [the nursing homes'] previous policy would result in [Plaintiffs] receiving the [nursing home] services they desire." 426 U.S. at 41. Thus, the FAC also fails to establish redressability.[3]

## V.     CONCLUSION

For the foregoing reasons, the Court again concludes that Plaintiffs lack Article III standing. Because Plaintiffs were unable to cure the deficiencies in their prior complaint after having been given an opportunity to do so, the Court finds that it would be futile to provide any further opportunity to amend. The action is DISMISSED with prejudice.

**IT IS SO ORDERED.**

Dated:  November 5, 2013

_____
JON S. TIGAR
United States District Judge

United States District Court
Northern District of California

---

[3] Plaintiff Dawson lacks standing for the additional reason that she seeks declaratory and injunctive relief on behalf of the estate of a deceased former SNF resident. Prospective relief cannot redress past harms.